**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Criminal Action |
| ) | No. 09-03039-01-CR-S-DGK |
| DENNIS DANIEL DUNNING, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Defendant filed a Motion to Suppress Evidence, in which he asserts that evidence seized as a result of an illegal detainment and subsequent search on February 3, 2009, be suppressed. The United States filed its response. The matter was set for an evidentiary hearing, which was held before the undersigned on October 21, 2009. The defendant was present with counsel, Stuart Huffman, and the United States was represented by Timothy Garrison, Assistant United States Attorney.

It is defendant's position that the detention, search and seizure, and arrest were unlawful and in violation of his Fourth Amendment rights because they were not based upon objectively reasonable articulable suspicion of criminal activity to detain, nor upon probable cause to search or arrest. He also asserts that the search and seizure exceeded the scope of the consent to search given by defendant. Defendant submits that all observations and statements made, and evidence obtained pursuant to the search and seizure, as well as the warrant, were obtained unlawfully, and

1

should be suppressed.

The government contends that defendant was lawfully detained upon the detaining officer's reasonable and articulable suspicion of defendant's criminal activity; the search of his person was conducted under the authority of his knowing and voluntary consent; the seizure of marijuana from his bag was valid as the marijuana was in plain view; the search of the bag was valid as a search incident to defendant's arrest; and the warrants authorizing the search of defendant's cabin and truck were issued upon independent showings of probable cause.

The government called Travis McConnell, a deputy sheriff with the Taney County Sheriff's Department. He was dispatched to assist Detective Ellis of the Taney County Sheriff's Department to go to Big Cedar Lodge regarding an investigation of credit card fraud, on February 3, 2009. He was told that a person calling himself "Joshua Fenner" was renting cabin 618 at Big Cedar Lodge, and that he had registered with his father, Edward Fenner's, credit card. [Tr. 3]. The loss prevention employees for the lodge contacted Edward Fenner, who told them that he did not have a son, and that he had authorized no one to use his credit card. The officers also found out that there was a second occupant of the room named "Dennis." A red Ford truck was also listed on the registration card. The lodge employees said that their cleaning department had told them that when they were cleaning the cabin, they noticed partial marijuana cigarette, known as "roaches," in the ash tray, as well as the odor of marijuana. [Tr. 4]. When the officers went to cabin 618, they located one individual, who was later identified as Adam Henderson. Inside the cabin, they discovered items used for the fraudulent use of credit cards, a check-writing program, and credit card numbers that were stolen from a business in Branson. Detective Ellis placed Henderson under arrest, took him to the Taney County Jail, and went to obtain a search warrant for cabin 618. The lodge employees

2

Case 6:09-cr-03039-BCW   Document 25   Filed 11/09/09   Page 2 of 16

changed the electronic key card lock for the cabin to secure it. Officer McConnell stayed, at Detective Ellis's request, to secure the location. The officers were expecting more people to show up at cabin 618. The lodge let them use cabin 620 for surveillance of 618. At that vantage point, he could see the front door and front side of cabin 618, as well as the roadway leading up to the cabins. As he was waiting in cabin 620, he heard a vehicle, a loud diesel Ford truck, coming up the road. A single male exited the red truck. The lodge employees said no other cabins were rented in the area, so anyone coming up the road would be going to cabin 618. The male was carrying a bag, and was attempting to enter cabin 618. When his key card didn't work, he started knocking on the door, and calling for "Adam." The officer made contact with this man, and asked him to come to cabin 620. Detective Ellis had told him to detain anyone for further questioning, who might come to that cabin. The officer was able to approach the man without being seen, and he acted confused at first. Once they were inside the cabin, the officer noticed that the man was guarding the bag he was carrying. He kept trying to move the bag out of the officer's sight and turning his body so that he could not see or have control of the bag. This is called "blading." [Tr. 7]. The officer could smell the odor of marijuana on his person. Based on his experience with being able to identify controlled substances, as well as the fact that he has an allergy to marijuana, he began to itch and his airway narrowed. Later, he was able to identify the individual as defendant Dennis Dunning. When they entered the cabin, defendant came voluntarily, and was not in custody, although he was not free to leave. Officer McConnell asked the same questions that he always does of a suspect, such as whether he had any guns, knives, bombs or explosives. He also asked him to place his bag on the couch in the room they were in in the cabin. He then asked for permission to search defendant's person. It was Officer McConnell's testimony that he said, "well, can I search you and he said

3

'yes.'" [Tr. 9]. He asked one time; he made no threats or promises, nor did he have his gun drawn. Defendant did not hesitate at all in granting consent. It was less than five minutes after he first encountered defendant when he asked for permission to search. The defendant made no complaints during the search, and did not ask him to stop. Defendant was wearing a heavy work coat, and it was hard to feel anything through the coat. "I reached inside his pocket because I couldn't quite feel for weapons or anything like that or any— because of the thickness." [Tr. 10]. The officer found a marijuana cigarette in his right coat pocket, and a black box in his right cargo pants pocket. The black box had a glass pipe in it, the type used for smoking illegal drugs, as well as several packets of a white powdery substance. At this point, because he knew what the drugs were, Officer McConnell placed defendant in handcuffs and placed him on the couch. This is where he had earlier asked him to place his bag. As he sat down, the officer moved the bag, to keep it out of defendant's reach. When he moved it, he turned the bag and noticed that it had a large velcro pocket on the back, which was open. He looked inside, and in plain view, he could see a large bag of a green leafy substance, which the officer knew to be marijuana. He then searched the rest of the bag, finding a pistol, some ammunition for a shot gun, a large package of a white powdery substance, a large amount of cash, and some digital scales. The officer <u>Mirandized</u> defendant, and asked him about the contents of the bag. Defendant said the bag had been left by someone in his truck the night before, and he did not know to whom it belonged. He said he had looked inside the bag, saw what was in it, and was bringing it back to Adam. Defendant said that he had previously been in cabin 618, and that he had some clothes in the bedroom. At that point, Officer McConnell called for other officers to come to the cabin, and continued to wait for Detective Ellis to return with the search warrant. Two of the officers who subsequently arrived also interviewed defendant.

4

Information they obtained, as well as what Officer McConnell had obtained, was used in an application for a search warrant for defendant's truck.

On cross examination, the officer admitted that the information they had when they initially went to the cabin was about credit card fraud. They also knew about the partial marijuana cigarettes in the cabin. The lodge employees did not indicate that they thought there was drug distribution occurring. He went into the cabin, and he admitted that he did have a slight reaction to the marijuana in the room. The symptoms usually dissipate in a few minutes after he gets outside. In this case, the symptoms had cleared up before defendant arrived on the scene. He admitted that Adam Henderson had denied consent to search cabin 618. When they went to the cabin and approached Henderson, they had lodge employees with them. Later, they got a warrant to search the room. At the time they spoke to Henderson, they did not have a search warrant. At some point, Henderson was arrested and taken away. These events occurred in the evening, and it was dark. He admitted that Detective Ellis told him to detain anyone who came to the cabin because they were expecting more individuals to come back to the cabin that night. The bag defendant was carrying was like a brief case, which was hanging over his shoulder. Officer McConnell was in uniform. When he was in cabin 620, he was there with one Big Cedar Security Officer, who was not in a uniform. They identified him once they got to cabin 620. He explained that he walked up to defendant and asked him to come with him; he was not free to leave, and the officer would have apprehended him if he had tried to flee. Defendant came with him willingly. Officer McConnell testified that he did not recall if he told him at that point that he was under arrest or being detained. He did not pat him down or conduct any type of a <u>Terry</u> search until he got him into cabin 620. He admitted that at this point, he had not seen the individual involved in any criminal activity, nor

5

did he see any traffic violation. They did know, however, that a red Ford truck was registered to cabin 618. They did not know if defendant was the other occupant. He admitted that defendant was being detained at that point. He had suspicions that he might have been involved with Henderson, although he agreed that could have been true of anyone who came to the cabin that night. Defendant kept adjusting the bag on his shoulder; it wasn't until the bag was on the sofa that he could see there was a velcro pouch on the bag. He did move the bag. At the point that defendant put the bag on the sofa, he couldn't see anything because defendant was actively moving the bag to keep it out of view, and was trying to keep himself between the bag and the officer. When he moved the bag out of defendant's control and reach, to the other end of the couch, he saw that the bag had come open. Defendant had been arrested by then, and was in handcuffs, after the officer had found contraband on him. He did not recall that defendant had made any kind of sudden movement towards the bag. Up to the point of the pat-down search, they did not know if defendant had weapons on his person. When just observing him, all he could see was a large coat, so there was no way to see if he had a weapon. The officer asked defendant if he could search him, and he said, "yes." [Tr. 24]. He agreed that when defendant was taken to cabin 620, two individuals were there with him, and he was not free to leave. He could smell marijuana on defendant, but otherwise had not seen any signs of criminal activity. The officer testified that it was more of a detention search, rather than a <u>Terry</u> pat-down search. When asked whether there was ever a <u>Terry</u> search, the officer stated that he "attempted to do one to begin with, but was unable to make sure that he didn't have weapons because of his oversized jacket and clothing." [Tr. 26]. Defendant offered no resistance, and complied with his request to allow the officer to search his person. Officer McConnell admitted that he did not ask defendant to unzip the jacket or take it off. It was only after patting down and

6

reaching into the coat pockets that he found the marijuana. He conducted a normal head-to-toe search; when he got to the cargo pants he felt an object he could not clearly identify, and asked defendant what it was. Defendant said he didn't know. The officer described it as a big, bulky object. The black box was taken out of his pants during the head-to-toe search. At some point, defendant provided them with a driver's license; the officer did not remember if it was before or after the search. He believed, however, that when they walked him into the cabin, he asked him what his name was, and he said, "Dennis." [Tr. 29]. He had his dispatch run his license after he had found the items of contraband. When he first came up on defendant, they talked very briefly; he thought he identified himself, but no questions were asked outside the cabin about why he was there. The initial contact was just brief until they went to cabin 620. At the time he searched and interviewed defendant, he did not know if they had obtained a warrant for cabin 618. He noticed that defendant did have a key card in his hand, but he did not ask him if he was an occupant of room 618. The officer believed that he moved the bag before defendant sat on the couch, which is where he told defendant to sit, even though he knew the bag was there. He did not look inside the truck before the other officers arrived. He believed they later did an inventory search of the truck before it was towed. He had nothing to do with the subsequent search of the truck.

On redirect, Officer McConnell testified that they got into cabin 618 through consent by the individual staying there. It was then that they saw the incriminating evidence. In terms of the lodge, they did not make a formal statement that they were reclaiming the room, but they did change the locks. In his training, and his knowledge of a <u>Terry</u> stop, the search was more invasive, but it was authorized by consent. He did not move the bag and see the marijuana inside until after defendant was placed under arrest. Defendant had had the bag in his physical possession just prior to the

7

arrest.

The government argued at the close of the suppression hearing that the detention of defendant was pursuant to reasonable suspicion of criminal activity, based on what Officer McConnell knew. He knew that there was criminal activity in cabin 618; the person who was registered to cabin had used a false name; there was another person also registered as a guest in that cabin; and there was a vehicle registered to the room. Additionally, the occupant of the room had been arrested at the scene. The factors relied on to establish reasonable suspicion of criminal activity included the fact that the officer saw a truck arrive on the scene, which matched the description of the truck registered to the room; an individual who had been driving the truck attempted to enter the room with a key card, like a guest, and then began calling the actual name of the occupant, Adam Henderson; and the officer noticed the smell of marijuana on that individual. It is argued that all of these factors are adequate to provide reasonable suspicion for the initial stop. Further, it is asserted that the search was consensual. After that, the items that were discovered were legally seized, including those based on the search warrant for defendant's truck, what was found in his possession, and what was found in the bag.

At the conclusion of the hearing, defendant relied on United States v. Royer, 460 U.S. 491, for the proposition that taking a person into another room or area goes beyond the purview of a Terry stop. He also contends that it was unreasonable to detain just anyone, which was the instruction Officer McConnell received from Detective Ellis.

Having fully reviewed the arguments of the parties, the testimony adduced at the hearing, and relevant case law, the Court finds that it must be recommended that defendant's motion to suppress be denied.

Initially, the law is clear that the protection against unreasonable searches and seizures is not limited to one's home, but extends as well to a person's privacy in temporary dwelling places, such as hotel or motel rooms. E.g., Stoner v. California, 376 U.S. 483, 490 (1964); United States v. Conner, 127 F.3d 663, 666 (8th Cir. 1997); United States v. Williams, 346 F.3d 796, 798 (8th Cir. 2003). Defendant contends that Adam Henderson was a guest at Big Cedar Lodge, and that he refused consent to a search of cabin 618. He also asserts that the hotel did not consent to a search of cabin 618. Therefore, defendant submits that the search of cabin 618 was an illegal warrantless search. The evidence adduced at the hearing established, however, that the officers were responding to a call from security staff at the lodge regarding evidence in that cabin of possible fraudulent credit card activity, as well as evidence of marijuana possession. Officer McConnell testified that they entered cabin 618 through consent by the individual staying there, Adam Henderson. They were accompanied by Big Cedar Lodge Staff. Although defendant disputes this, it is obvious that he was not present and would have no idea whether Mr. Henderson consented or not. Once inside, the officers saw incriminating evidence of fraudulent activity and drug possession. Mr. Henderson was arrested and taken to the Taney County Jail, and Detective Ellis proceeded to obtain a search warrant for cabin 618. Big Cedar Lodge employees reconfigured the key card lock on the cabin door, thereby reclaiming the cabin. Accordingly, the Court believes that based on the credible testimony before it, no warrantless search occurred.

Regarding defendant's contention that the detention and arrest were unlawful, the Supreme Court has placed police-citizen encounters into three categories. United States v. Poitier, 818 F.2d 679, 863 (8th Cir. 1987). First, there are communications that are consensual and involve no coercion or restraint, which are outside the scope of the Fourth Amendment. Id. at 863; Terry v.

Ohio, 392 U.S. 1, 19 (1968).  In contrast, Terry stops do invoke Fourth Amendment protection.  In such an encounter, a police officer may stop and briefly question an individual, may ask for identification, and may conduct a limited pat down, if the officer has a reasonable suspicion of criminal activity.  Id. at 19.  Finally, there are "highly intrusive, full-scale arrests, which must be based on probable cause."  Id.

Having fully reviewed the evidence, the Court finds that, based on the credible testimony adduced at the hearing, Officer McConnell had reasonable suspicion of criminal activity to support his actions.  The relevant factors this Court finds persuasive regarding the legality of the initial detention are the fact that the officers were investigating a report by Big Cedar Lodge employees regarding possible credit card fraud.  Pursuant to their investigation, the officers went to the cabin with lodge employees, after having been informed of the fact that housekeeping employees had also found partial marijuana cigarettes in cabin 618.  According to the credible testimony of Officer McConnell, after being allowed into that room pursuant to the guest's consent, the officers made other observations that indicated there was a credit card fraud operation in place.  Based on this evidence, they arrested the guest, Adam Henderson, who had assumed a false name and fraudulently used a credit card to rent the cabin.  They were allowed, by Big Cedar staff, to occupy cabin 620, after Henderson was arrested and transported to the Taney County Jail.  The staff reconfigured the lock for cabin 618, so that the key cards previously used to open the door would no longer work.  Officer McConnell stayed, at Detective Ellis's direction, to secure cabin 618 while Detective Ellis went to obtain a search warrant.  From the vantage point of cabin 620, Officer McConnell could maintain physical surveillance of cabin 618, and had a clear view of the road leading up to the cabin.  Officer McConnell testified candidly that he was told by Detective Ellis to detain anyone who came

to cabin 618. Although defendant has relied on this testimony and statement to suggest that the initial contact with defendant exceeded the scope of a Terry stop, it is important to take the statement and the intention in context. At that point, Officer McConnell knew that the only cabin that was rented on that road was 618; one registered guest, who had been evasive, given a false name, and fraudulently used a credit card, had been arrested and transported to jail on the basis of evidence of criminal activity found in cabin 618 during a consensual entry into that cabin. There was another guest, a male named "Dennis," registered to that room. There was also a red Ford truck registered to the room. The officer knew that there shouldn't have been any traffic on the roadway except for someone coming to cabin 618, and they expected that there would be other individuals coming to cabin 618, given that Henderson was not the only registered guest. Based on the totality of the information available to the officers at the time, their intention to briefly detain anyone who came to cabin 618 does not, in the Court's opinion, fall out of the purview of Terry. In this particular case, however, the focus should be on what occurred with defendant. In addition to the information of which the officer was already aware, he also observed defendant driving in a truck that matched the description of the truck registered to cabin 618; he saw him attempt to enter that cabin with a key card; when he could not open the door, Officer McConnell heard defendant call out the name, "Adam," which was the true name of the other registered guest, who had been arrested shortly before this. It was reasonable for the officer to conclude, therefore, that this individual was the other male, "Dennis," who was also registered in cabin 618, and that the truck was the same red Ford truck that was listed on the registration card. Additionally, when Officer McConnell approached defendant, he was aware that defendant was attempting to shield the bag he was carrying from the officer's view; further, he smelled the odor of marijuana emanating from defendant's person. The

11

Court is satisfied that the officer had reasonable cause to believe that criminal activity was occurring or likely to occur when he approached and stopped defendant. The actions taken in approaching defendant and asking him to accompany him to cabin 620 were appropriate and within the purview of <u>Terry</u>, and the investigatory detention of defendant was not an unreasonable seizure in violation of defendant's Fourth Amendment rights.

Regarding the search of defendant's person, which the government concedes exceeded the typical scope of a <u>Terry</u> pat down, the officer testified that because he could not conduct a limited pat down search, given the bulkiness of defendant's coat, he requested consent to search defendant's person, which was granted. There was no evidence to dispute the officer's representation regarding the consent given. It should be noted, moreover, that the officer's search was no more invasive than patting him down, reaching inside defendant's coat pocket, and reaching inside the pocket of his cargo pants.

"[W]here the validity of a search rests on consent, the [government] has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." <u>Florida v. Royer,</u> 460 U.S. 491, 497 (1983) (plurality opinion). Whether a defendant freely and voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances. <u>United States v. Mendenhall,</u> 446 U.S. 544, 557 (1980).

The Eighth Circuit Court of Appeals has enunciated a number of factors to determine whether consent to search has been voluntarily given. <u>United States v. Chaidez</u>, 906 F.2d 377, 381 (8th Cir. 1990). Some of the factors relating to the person giving consent include age, general intelligence and education, prior experience with law enforcement, and whether he or she was under

12

the influence of drugs or alcohol. See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003) (internal citations omitted). Conduct of law enforcement to be considered includes the length of the detention, whether there was physical intimidation, if the defendant was in custody or under arrest, if the police made promises or misrepresentations, if the interrogation was in a public place, and whether the accused objected to the search or stood by silently. Id. at 805.

In the instant case, there is nothing to suggest that defendant is not of average intelligence. Other than the officer's statement that he could smell marijuana on defendant's person, there was no testimony to suggest that he was under the influence of any drugs or alcohol at the time of the incident, or that he was otherwise mentally impaired in any way. There are no factors present in this case that would suggest that defendant's ability to render voluntary and knowledgeable consent was compromised in any manner. There were also no factors regarding the conduct of law enforcement that would invalidate the voluntariness of his consent. The fact that one officer in uniform asked defendant to accompany him to another cabin in the vicinity where they could talk, and one lodge employee who functioned as a security guard was with them, cannot be said to constitute an overwhelming or oppressive police presence. The Court believes that the circumstances surrounding defendant's consent raise no inference that it was in any way coerced.

To persuade the Court that his consent was not an act of free will, defendant refers to Royer, 460 U.S. at 500, which held that an illegal detention by the police negates any inference that a consent to search seized luggage at an airport stop was voluntary. That case, however, is inapposite to the instant one. In Royer, two plainclothes detectives believed that a suspect was carrying narcotics in his duffel bag when he checked in for a flight. The agents confronted the suspect, took his airline ticket and identification, and asked him to follow them into a small room away from the

13

passenger concourse, where they interrogated him and where he ultimately consented to the search of his bags. The detectives had also retrieved his bags from luggage claim and taken them to the small closet-like room.  The Supreme Court held that, for all practical purposes, Mr. Royer was under arrest. At the time that he gave his consent, therefore, the Court, in a fractured decision, concluded that, "any consensual aspects of the encounter had evaporated." Id. at 503.  In the instant case, the search of defendant's person was conducted with his consent, which the Court finds, under the circumstances, was an act of free will. He was only asked one time for permission to search. They clearly had reasonable suspicion of criminal activity for the Terry stop, and the officers could have legally conducted a limited pat-down for their own protection without his consent.  Because of the bulky nature of his outer coat, however, they could not accomplish a proper search for officer safety.  Additionally, they went to another cabin, at night, in February, which was no doubt for the convenience of all, and does not conjure up the kind of oppressive environment of Royer.  The time that Officer McConnell detained him until he asked for consent to search was less than five minutes, and clearly was not unduly lengthy; while defendant was not free to leave, he was not under arrest at that time; and there was no testimony or even a suggestion that the officer offered him anything in exchange for his consent or made any threats or promises to him whatsoever to coerce him into allowing him to search.  The officer testified that defendant gave his consent without hesitation, that he never withdrew it, and he never asked the officer to limit or curtail his search. Accordingly, the Court finds that, based on the credible testimony adduced at the hearing, defendant's consent was voluntary, and the fact that the search of his person may have exceeded a limited Terry pat down, was not in violation of defendant's Fourth Amendment rights.  Once the officer discovered the marijuana cigarette and the box that contained various drug paraphernalia, there was obviously

14

probable cause for defendant's arrest.

Regarding the subsequent search of the bag defendant was carrying, Officer McConnell credibly testified that when he moved the bag that defendant had tried to shield from his view, in order to ensure that it was not within arm's length of defendant as he sat down after having been arrested, the bag came open. Based on his testimony, he saw, in plain view, green leafy marijuana. To qualify under the plain view exception, the government must prove that (1) the item is in plain view; (2) the officer is lawfully located where he may view the object; and (3) the incriminating nature of the evidence is "immediately apparent." Horton v. California, 496 U.S. 128, 136-37 (1990). "Immediately apparent" requires that the agent have " 'probable cause to associate the property with criminal activity.' " United States v. Garner, 907 F.2d 60, 62 (8th Cir. 1990)(quotation omitted); United States v. Clay, 579 F.3d 919, 932 (8th Cir. 2009). Based on Officer McConnnell's testimony, a pouch on the bag inadvertently came open when he moved the bag. Once the marijuana was seen, it could be legally seized under the plain view doctrine. Based on defendant's arrest by that time, the evidence located in the bag under further scrutiny was legally obtained, as a legal search incident to arrest. See Chimel v. California, 395 U.S. 615, 632 (2004). Finally, the search of the truck was conducted pursuant to a search warrant, and because the evidence in support of that warrant was legally obtained, there is no argument for suppression under the fruits of the poisonous tree doctrine.

Based on a careful review of the totality of the circumstances under the particular facts of this case, the Court finds that the officers had sufficient information to reasonably assume that criminal activity might be occurring when they stopped defendant. Accordingly, their initial investigative detention was lawful under Terry, and their subsequent actions were lawful under the

circumstances. Therefore, it will be recommended that defendant's motion to suppress be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri, it is RECOMMENDED that defendant's Motion to Suppress be denied.

     /s/ James C. England
JAMES C. ENGLAND, CHIEF
United States Magistrate Judge

Date: 11/9/09